IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 82063-0-I |
| | ) | |
| AIRELLE BETH VANWEY, | ) | |
| | ) | |
| Respondent, | ) | |
| and | ) | |
| | ) | |
| SCOTT HENRY VANWEY, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — Scott Vanwey appeals a child support order and findings of fact in support of a decree of dissolution. He contends that the trial court erred in concluding that he and Airelle Vanwey were in a committed intimate relationship prior to marriage. He also contends that the trial court erred in failing to impute income to Airelle, denying his request for a deviation from the basic child support obligation, and requiring him to pay an equal share of credit card debt that was in Airelle's name.[1]

We affirm.

---

[1] Because the parties share the same last name, we refer to them by their first names for clarity.

FACTS

Airelle and Scott met and began dating in 2008.  In April 2009, Airelle moved in with Scott, into a townhouse that Scott was renting in Tacoma.[2]  At the time, Airelle was working full time for Sprint.  Scott paid the rent and bills on the townhouse, and Airelle "help[ed] pay for food and stuff like that."[3]  Airelle also brought furniture and two vehicles to the relationship.  However, the parties continued to maintain separate finances and bank accounts.

Once living together, the parties began talking about marriage and having children.  The parties also began planning to buy a house together.  Airelle stated that the parties discussed what they were looking for in a house:

> We wanted it to be close to schools because we knew that we were, wanted a family, to have children, so we wanted it to be, you know, close to schools. . . . Location, close to schools, fenced backyard.  A safe area was important for [us] to raise our family.  We wanted a safe area.[4]

In March 2010, Scott and Airelle bought a home together in Orting, Washington.  Airelle "did all the online research to find the house."[5]  According to Airelle, "We saved money on purchasing it because I knew the builder, and then my dad helped us out."[6]

---

[2] Airelle was able to remember the exact date because she broke both her arms and moved in with Scott so he could help take care of her.

[3] Report of Proceedings (RP) (June 4, 2019) at 17.

[4] Id. at 19-20.

[5] Id. at 19.

[6] Id. at 20.

Airelle testified that the parties decided to put Scott's name on the title to the home as well as the loan to purchase it:

> We had a long discussion about it, but essentially we weren't married yet, and we were just engaged at the time, so he said it's just going to go in my name; and then that makes for easier math, I guess. And then he said, "Later on down the line after we get married, then we'll refinance it." Because the rate was high, anyways, at the purchase time; it was, like, five percent. So he said, "We'll refinance it, and then we'll put it in both of our names." And I also had the wedding debt. Our wedding was, like, $22,000 that I paid for, so I had all the wedding debt underneath my name on my credit cards.[7]

Scott also paid the mortgage on the house. According to Airelle, Scott would not let her pay the mortgage and "was adamant that [the mortgage payments] come from his sole, own checking account."[8]

However, Airelle arranged for several renovations to the Orting house, including tiling in the kitchen, fresh paint, and a concrete patio. She stated that she paid for at least half of these renovations herself, or she traded hairstyling services for them. She also purchased new rugs and window blinds. Airelle stated that she paid the homeowners' association dues and all of the utility bills and "basically everything besides the mortgage."[9]

In July 2010, Scott purchased an engagement ring and proposed marriage. The parties were married in January 2011. Airelle paid for the majority of the wedding expenses using her own credit cards.

---

[7] Id. at 20-21.

[8] Id. at 27.

[9] Id. at 30.

3

Airelle gave birth to the couple's daughter in April 2013. Airelle went on maternity leave for "six, seven months."[10] When she returned to work at Sprint, she worked only one day a week. Airelle stated that she did "[e]verything that stay-at-home moms do," including cooking, cleaning, yard work, and childcare.[11] Because she had minimal income, Airelle incurred more credit card debt to pay household expenses. Scott took over paying the utility bills. But Airelle continued to pay for things such as diapers and other household items, some of the daycare fees, and their daughter's dentist bill. In January 2015, Airelle got a new job at Wells Fargo in January 2015, working 20 hours per week.

In December 2017, Airelle filed a petition for dissolution. Trial on the petition took place on June 4 and June 5, 2019. Airelle testified that she moved out of the Orting house in November 2017, and was currently renting an apartment in a low-income housing complex for her and their daughter. She continued to work 20 hours per week at Wells Fargo. She testified that she could not work more hours because then her income would exceed the level at which she would be allowed to live in low-income housing.

The court found that the parties began a committed intimate relationship in August 2009 when they moved in together. As a result, the court concluded, "[T]he parties started acquiring community property and incurring community debt

---

[10] Id. at 47.
[11] Id. at 48.

4

at this date."[12]  The court determined that the Orting house was "community property pursuant to the findings of fact of a committed intimate relationship existing as of the date of the purchase of the property and continuing throughout the relationship and marriage until the date of separation."[13]  The court awarded Airelle half of the equity in the Orting house, totaling $45,259.  The court characterized all the debt held by the parties as community debt, except for two vehicle loans, which it characterized as Scott's separate debt.  The court ordered that Scott pay Airelle $2,306.00 to equalize the difference in community debts as of the date of separation.  The court also entered an agreed parenting plan giving Scott and Airelle equal residential time with their daughter.

Scott appeals.

DISCUSSION

Scott first claims that the trial court erred in concluding that the parties were in a committed intimate relationship at the time the Orting house was purchased in March 2010.  Thus, he argues, the trial court erred in characterizing the Orting house as community property.  We conclude that the trial court's unchallenged findings of fact supported its conclusion that the parties were in a committed intimate relationship and the Orting house was community property.

A committed intimate relationship "is a stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them

---

[12] Clerk's Papers (CP) at 54.

[13] Id.

does not exist."[14]  Relevant factors establishing such a relationship include

"continuous cohabitation, duration of the relationship, purpose of the relationship,

pooling of resources and services for joint projects, and the intent of the parties."[15]

These factors are not exclusive, and no single factor is determinative.[16]  The

circumstances of each case must be examined to determine if a committed

intimate relationship exists.[17]

Property acquired during a committed intimate relationship is presumed to

be community property.[18]  Whether a committed intimate relationship exists and

whether that conclusion of law flows from the court's findings are questions of law

that we review de novo.[19]  We review a trial court's factual findings for substantial

evidence.[20]  Evidence is substantial where it is "sufficient to persuade a rational

fair-minded person the premise is true."[21]  We defer to the trier of fact to resolve

---

[14] Connell v. Francisco, 127 Wn.2d 339, 346, 898 P.2d 831 (1995).

[15] Id.

[16] In re Marriage of Pennington, 142 Wn.2d 592, 602, 14 P.3d 764 (2000).

[17] Id. at 602-03.

[18] Connell, 127 Wn.2d at 350-51; see also In re Committed Intimate Relationship of Amburgey, 8 Wn. App. 2d 779, 788, 440 P.3d 1069 (2019) ("[A]pplication of marriage principles by analogy applies . . . once the existence of a CIR has been established.").

[19] Pennington, 142 Wn.2d at 602-03.

[20] In re Marriage of McDole, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993).

[21] Sunnyside Valley Irr. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003).

conflicting testimony, evaluate the persuasiveness of evidence, and assess the credibility of witnesses.[22]  Unchallenged findings of fact are verities on appeal.[23] The trial court made the following findings of fact in support of its conclusion that Scott and Airelle were in a committed intimate relationship as of August 2009:

> The court finds the following facts determine there was a committed intimate relationship regarding the just and equitable distribution of the equity in the Orting home:
>
> There was a Committed Intimate Relationship between the parties starting when they moved in together at the latest in August of 2009;
>
> The parties were in an exclusive relationship from the day they moved in together five months after they met through their marriage until the date of separation;
>
> The parties shared expenses from the date they moved in together, through the purchase of the Orting home, through their marriage, up until the date of separation;
>
> The parties were married less than two years after they moved in together and less than one year after the purchase of the Orting home;
>
> Mr. Vanwey purchased a wedding ring in July of 2010, four months after the purchase of the Orting home;
>
> The purpose of the parties' relationship all along was to have a family and create a home and provide emotional and financial support for each other;
>
> There was a pooling of various forms of resources between the parties;

---

[22] In re Marriage of Akon, 160 Wn. App. 48, 57, 248 P.3d 94 (2011).

[23] Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 819, 828 P.2d 549 (1992).

The parties did maintain separate bank accounts and credit card accounts, however, despite keeping those accounts separate the parties did function as a community unit;

Mr. Vanwey purchase[d] the Orting home in his name and obtained a loan in his name;

The parties continued to reside in a community like relationship together and raised a daughter together after the purchase of the Orting home;

Mrs. Vanwey paid for household expenses and food;

Mr. Vanwey paid for the home mortgage and some food at all times;

Mr. Vanwey supported both parties and the child after the birth of their daughter in April of 2013;

Both parties contributed to [their daughter's] day care;

Mrs. Vanwey spent time and effort in locating the Orting home;

Mrs. Vanwey made some contributions financially to the work on the family home in that she purchased blinds, and fencing, concrete, and paid for paint work, and bartered hair work for some household work;

Mrs. Vanwey worked full-time before [their daughter] was born, and then worked part-time and brought home substantially less;

Mrs. Vanwey also contributed to the labor in working on fixing up the home and labor in support of a home comes in different forms and can be just as worthwhile in the market place as actual financial expenses.

Conclusion: Based upon the above findings of fact, the division of real property described in the final order is fair (just and equitable).[24]

Scott does not assign error to any of the court's specific findings of fact.

Instead, Scott argues that the trial court's findings were inadequate to support the

---

[24] CP at 54-55.

conclusion that a committed intimate relationship existed at the time the Orting house was purchased. He argues that the "continuous cohabitation" was the only factor present supporting the existence of a committed intimate relationship.

We disagree. The court found that the parties were "in an exclusive relationship from the day they moved in together."[25] It found that they "shared expenses from the date they moved in together" and that, despite having separate financial accounts, there "was a pooling of various forms of resources between the parties" and "the parties did function as a community unit."[26] It found that the parties intended throughout their relationship to be a family and create a home together. It noted Airelle's contributions to the household expenses, the renovations, and the household labor, finding that "labor in support of a home comes in different forms and can be just as worthwhile in the market place as actual financial expenses."[27] Because Scott does not challenge any of these findings, we treat them as verities. These unchallenged findings adequately establish that the parties were in a committed intimate relationship. Scott's argument that there were no other factors establishing a committed intimate relationship other than continuous cohabitation is not supported by the record.

Next, Scott claims that the trial court erred in failing to impute income to Airelle under RCW 26.19.071(6). He also challenges the trial court's denial of his

---

[25] CP at 54.

[26] CP at 54-55.

[27] Id.

9

request for a deviation from the child support schedule, and contends the trial court erred in failing to make findings in this regard as required by RCW 26.19.075(3). We conclude that Scott did not adequately raise these issues at trial and thus, the record is insufficient to establish error.

In determining the amount of child support owed, a trial court first sets a basic support obligation.[28] This is based on the statute's economic table, which is based on the parents' combined monthly net income and the number and age of the children.[29] In determining income, a trial court shall impute income to a parent who is voluntarily unemployed or voluntarily underemployed.[30] A determination of whether a parent is voluntarily underemployed depends on various factors including the parent's assets, residence, and employment and earnings history.[31] After determining the basic support obligation, a trial court may consider whether to deviate from that calculation.[32] "The court may deviate from the standard calculation if the child spends a significant amount of time with the parent who is obligated to make a support transfer payment."[33] The purpose of granting such a

---

[28] RCW 26.19.011(1).

[29] Id.

[30] RCW 26.19.071(6).

[31] Id.

[32] RCW 26.19.011(4), (8).

[33] RCW 26.19.075(1)(d).

deviation is to recognize the "increased expenses" that a parent sometimes has when placement is shared.[34]

We review a trial court's decision on an order of child support for an abuse of discretion.[35] A trial court abuses its discretion if the decision rests on unreasonable or untenable grounds.[36]

Scott did not file a trial brief raising the issues of imputation of income or a deviation from the child support schedule. Nor did he identify these issues for trial in his opening statement. Airelle acknowledged this in her opening statement, stating:

> The parenting plan should not be at issue. Child support, I don't believe, is at issue either, that child support was last set in November of 2018, and their incomes likely haven't changed much since then, so it should stay the same for their incomes.[37]

Scott did not address the imputation of Airelle's income during the presentation of evidence. And he did not raise the issue of a deviation until immediately before closing argument, when he testified that he and Airelle had agreed to increase his residential time and he wanted his child support payment to be "adjusted appropriately" with "some type of residential credit."[38] He did not

---

[34] RCW 26.19.075(1)(d).

[35] State ex rel. M.M.G. v. Graham, 159 Wn.2d 623, 632, 152 P.3d 1005 (2007).

[36] In re Marriage of Leslie, 90 Wn. App. 796, 802-03, 954 P.2d 330 (1998).

[37] RP (June 4, 2019) at 37.

[38] RP (June 5, 2019) at 199.

present any evidence or testimony regarding any increased expenses he would incur once the parties shared residential time equally.

For the first time, in closing argument, Scott claimed that Airelle was voluntarily underemployed since she chose not to work full time:

> And I think what was really interesting is she is in a job where she's getting 20 hours a week to work, and she's showing absolutely no interest or motivation to improve her own earning income potential, and her reasoning is if I do that, I will lose the housing that I'm at because it's low-income housing. [B]asically, she's being voluntarily underemployed, Your Honor. She is choosing to do that and choosing actually not to be able to do her share to provide for her own support for herself and for her child.[39]

But Scott did not request that the trial court impute income to Airelle under RCW 26.19.071(6). Scott also reiterated his request for a deviation in closing argument. But his request appeared to stem from his claim that Airelle was voluntarily underemployed and not any of the identified grounds for deviation under RCW 26.19.075:

> As to my client requesting a deviation, I do think that is appropriate. There would still be some transfer payment, but again, it seems that . . . it would be one thing if Ms. Vanwey was working 40 hours a week and making $2,600 a month, but that's not what's happening here, Your Honor. I think it is appropriate for a deviation to be given because the negative impact is really -- wouldn't be because of the deviation, Your Honor. The negative impact to the household of Ms. Vanwey would be the fact that she is voluntarily underemployed.[40]

---

[39] Id. at 211-12.

[40] Id. at 213.

In her rebuttal closing argument, Airelle contended that Scott had not offered any evidence supporting a deviation from the basic child support obligation:

> And regarding the deviation that Mr. Vanwey is requesting, I state that he has not presented any evidence of his increased expenses . . . . I don't think his house payment is going to be any different because his daughter would be staying there another night a week and certainly not any other expenses, so the child support deviation should not be granted.[41]

The trial court's ruling reflected its understanding that the issue of child support was not before it:

> It appears the issues involved in this case come down to whether or not there was a committed intimate relationship prior to the entry of the very short-term marriage of six years and about ten months; and, two, what is a just and equitable distribution of assets and debts?[42]

Accordingly, the trial court did not orally rule on Scott's argument that Airelle was voluntarily underemployed. And it denied Scott's request for a deviation, ruling "there will be no deviation from the standard calculation."[43]

In the final child support order, the trial court calculated Airelle's monthly net income as $2.412.88 and Scott's monthly net income as $4,275.04. It did not impute income to Airelle. It also ordered that the monthly child support amount would not deviate from the standard calculation, stating, "[N]either parent asked for a deviation from the standard calculation."[44] At a presentation hearing held two

---

[41] Id. at 215-16.

[42] Id. at 216.

[43] Id. at 221.

[44] CP at 27.

weeks after the trial, Scott did not challenge the final child support order nor request that the trial court made findings in support of its denial.

An appellate court may refuse to review any claim of error which was not raised to the trial court.[45] Here, Scott did not request that the trial court impute Airelle's income below. His assertion in closing argument that Airelle was voluntarily underemployed was insufficient to notify the trial court of this claim.[46] As for Scott's request for a deviation, Scott did not identify the grounds for a deviation in his argument to the court. At no time did Scott request the trial court make findings of fact as to imputation or deviation. Because Scott did not adequately raise these claims of error before the trial court, we decline to consider them.

Finally, Scott claims that the trial court erred in granting Airelle's request "to have the debt that was in her name characterized as community property."[47] We conclude the trial court was within its discretion to equitably divide the parties' debt.

Upon determining that a committed intimate relationship exists, a trial court may distribute property and debt acquired during the relationship that would be

---

[45] RAP 2.5(a).

[46] See, e.g., Burch v. Burch, 81 Wn. App. 756, 762, 916 P.2d 443 (1996) (a party's entry of contrary child support worksheets is not enough to notify the trial court of an objection; "[i]t is each party's obligation to raise issues that must be addressed by the trial court.")

[47] Appellant's Br. at 19.

treated as community property were the parties legally married.[48] Property and

debt acquired during a committed intimate relationship are presumed to be

community property and community obligations.[49] This presumption applies even

if the property, income, or debt is held or titled in only one party's name.[50] To

overcome the presumption, a party must provide "clear and convincing" evidence

that income, property, or debt was acquired with funds, or at a time, that would

characterize it as separate property or debt had the parties been married.[51] A trial

court has broad discretion to make a just and equitable distribution of property and

debt, and this court will affirm unless the appellant demonstrates that the trial court

manifestly abused this discretion.[52]

Here, the trial court orally ruled that the debt incurred during the committed

intimate relationship and marriage was community debt that would be shared

equally between the parties:

> Debt incurred during a relationship for community-like
> purposes is considered community-like debt, so the distribution of
> the debt will be as follows: Each party is responsible for their
> individual debt incurred after the date of separation. Each party is

---

[48] Muridan v. Redl, 3 Wn. App. 2d 44, 56, 413 P.3d 1072 (2018).

[49] Connell, 127 Wn.2d at 350-51; see also In re Committed Intimate Relationship of Amburgey, 8 Wn. App. 2d 779, 788, 440 P.3d 1069 (2019) ("[A]pplication of marriage principles by analogy applies . . . once the existence of a CIR has been established.").

[50] Connell, 127 Wn.2d at 351.

[51] Id.; see also In re Marriage of Chumbley, 150 Wn.2d 1, 5, 74 P.3d 129 (2003).

[52] In re Marriage of Wright, 179 Wn. App. 257, 261, 319 P.3d 45 (2013).

responsible for half of all debt incurred during the committed intimate relationship and the marriage.[53]

The trial court specifically identified as community debt the debt on four credit cards as well as unpaid daycare and dental expenses pertaining to their daughter.

Scott argues that Airelle identified the credit card debt as her own separate debt in the dissolution petition, and thus, the trial court should have ordered Airelle to be responsible for it. But in order to overcome the presumption that the debt belongs to the community, Scott must present clear and convincing evidence that the debt is separate. Airelle testified that she initially requested to pay the credit card debt because she did not trust Scott to pay any debts that were in her name. But Airelle later filed a motion for a temporary order requiring Scott to pay the debt associated with two of the credit cards. Scott does not present clear and convincing evidence to overcome the presumption that the debt is community debt. In light of the fact that the trial court found that Scott and Airelle acted as an economic unit during their relationship, the trial court's characterization of the debt was not a manifest abuse of discretion.

Both parties request attorney fees on appeal. RAP 18.1(a) authorizes a party to recover reasonable attorney fees and expenses so long as the party "request[s] the fees or expenses" and "applicable law grants to a party the right to recover." RAP 18.1(b) requires "[a]rgument and citation to authority as necessary to inform the court of grounds for an award, not merely a 'bald request for attorney

---

[53] RP (June 5, 2019) at 220-21.

fees.'"[54]  Because Scott does not identify a basis for fees, we decline to consider

his request.  Airelle contends she is entitled to fees under RCW 26.09.140, which

permits an award of fees in dissolution proceedings based on "the financial

resources of both parties."  Considering the parties' relative ability to pay and the

merits of the issues raised on appeal, we conclude Airelle is entitled to an award of

fees, subject to compliance with RAP 18.1.

Affirmed.

_____

WE CONCUR:

_____        _____
Mann, C.J.                      Appelwick, J.

---

[54] Hudson v. Hapner, 170 Wn.2d 22, 33, 239 P.3d 579 (2010) (alteration in original) (quoting Wilson Court Ltd. P'ship v. Tony Maroni's, Inc., 134 Wn.2d 692, 710 n.4, 952 P.2d 590 (1998)).